ELISHA JACKSON and PRISCILLA JACKSON, his Wife, *vs.* JAMES A. MYERS and JACOB MYERS, Jr., trading as MYERS BROTHERS.

*Negotiability of a Note issued by a Building Association—Liability of Endorsers of such Note.*

A Building Association was organized in August, 1871, under the Act of 1868, ch. 471, the general incorporation law of the State, and by the IXth and XIth Articles of its association, it was provided that its Board might issue promissory notes on mortgages only, and that such notes should always be drawn to the order of the mortgagor, who should in all cases endorse the notes thus drawn. The President, Secretary, Treasurer and three Directors were authorized to sign all promissory notes issued by the Association. Under the authority of these Articles the Association issued its note to the appellees instead of money, for which a mortgage was given. The note was strictly in form, a promissory note, payable to the order of the appellees. It was drawn at sixty days time, and payable at a certain named bank; and was signed by the officers designated in the Articles of Association to execute promissory notes. In one corner of the face of the note, there was the type or emblem of what was alleged to be the seal of the corporation; this alleged seal consisted simply of an emblem or symbol printed by the printer at the time when the printed blank note was struck. The note was endorsed by the payees and by them negotiated, and at maturity was duly presented for payment, and was dishonored and protested, and notice given by the notary to the said endorsers, and payment duly demanded of them. Suit was brought on the note by the endorsees against the endorsers, who contended that they were not liable by reason of their endorsement, because the instrument sued on was a single bill. HELD:

1st. That the note sued on was a negotiable promissory note, and by the endorsement thereof in the ordinary way, the endorsers became liable.

2nd. That the very nature of the transaction itself, the objects and purposes to be subserved by the issue of the note, as well as its form, plainly indicated that the parties must have understood that the note was negotiable, and that it would be so accepted and dealt with by the commercial community.

3rd. That the symbol or printed representation of the seal, if it be conceded to be a sufficient seal, was not printed on the note to restrain its negotiability, or to change it into a specialty, but rather as a mark of genuineness.

4th. That the note in no manner depended upon the seal for its validity, but derived its entire authenticity from the signatures of the officers authorized to execute it.

APPEAL from the Superior Court of Baltimore City.

This was an action of *assumpsit* brought by the appellants against the appellees as endorsers of the following promissory note:

$900.                          Baltimore, *June 21st*, 1873.

*Sixty days* after date, Old Town Permanent Building Association, promises to pay to the order of *Myers Brothers*, *nine hundred* $\frac{00}{100}$ dollars, with interest, for value received, payable at the German Savings Bank.

> *Thomas H. Boyer*, Prest.
> *Robt. L. Dickey*, Secy.
> *A. S. Miles*, Treas.

*G. S. Windsor*,
*Martin Zirpe*,
*John A. Stokes*, Directors.
(Seal of Old Town Permanent
    Building Association.)

On the margin of the note was the memorandum:

" This note is issued on mortgage of *Myers Brothers*, left for record *June* 18th, 1872."

The words of the note *italicised* were written with a pen, and the words or portions not *italicised* were printed: and the circle around the words; " Seal of Old Town Permanent Building Association," as well as the words themselves, were printed; and it was proved that the said words and circle, and other printed portions, constituted a printed form used by the officers of the corporation in

writing the promissory notes issued under Articles nine and eleven of the Constitution, and that many such notes had been issued and negotiated. The genuineness of the signatures to the note, as also of the endorsement of the defendants thereon, was proved by the plaintiffs.

It was admitted that the Old Town Permanent Building Association was incorporated on the 31st of August, 1872, under the Act of 1868, ch. 471, the general incorporation law of the State. Article IX of the Constitution of the Association was as follows:

Sec. 1. The Board may issue promissory notes on mortgage only, and must always be drawn to order of mortgagor. When a transfer of mortgage is executed, all notes must be lifted or new ones drawn to order of the new mortgagor, and in case of renewal of notes the new ones must also be drawn to order of the mortgagor, and mortgagor must in all cases endorse the notes when to his or her order.

Sec. 2. The Board may accept or negotiate promissory notes of any good, responsible building association or other corporation in good standing and credit, in payment for stock in this Association, and on terms to be arranged by the Board.

Article XI, was as follows:

The president, vice-president, secretary, treasurer, comptroller and directors shall constitute the Board for the transaction of such business as shall be entrusted to them by these Articles, a majority of whom shall constitute a quorum. They may hold special meetings whenever called by the president. They shall have the general supervision of the affairs of the Association, and the duties of its officers. The president, secretary, treasurer, and three directors, shall sign all promissory notes issued and authorized by the Association. They shall incur no expense, except providing for the necessary accommodations of their own and regular meetings, when authorized to do so by a vote of this Association. They shall judge of the sufficiency of

all mortgages and other securities offered to this Association.

The plaintiffs proved by one Rennolds that in 1872 the defendants told the witness, they had a good Building Association note—naming the Old Town Permanent Building Association as the maker—endorsed by themselves, which they wanted to negotiate; he thereupon informed Miss Priscilla Lynch (since married and one of the appellants) who upon his advice, authorized him to take the offered note; with her money he paid the defendants nine hundred dollars, less an agreed discount, and received the note from them and gave it to the said Priscilla. That the note so negotiated was dated June 18th, 1872, and was payable twelve months after date to the order of the defendants; was endorsed by them in blank, and was otherwise like the note sued on. A mortgage executed to the Old Town Permanent Building Association by the appellees, dated June 18th, 1872, and duly recorded, was offered in evidence, and admitted to be the same mortgage referred to in the margin of both of said notes. When the twelve months' note was about maturing, the appellees applied to Rennolds, as he testified, to have it renewed for sixty days; he saw Miss Lynch and she consented to take a renewal of the note with endorsement of the appellees; that one of the appellees brought him the note sued on, and the original or twelve months' note was surrendered.

The note sued on was presented at maturity, for payment, was dishonored and protested, and notice given by the notary to the appellees as endorsers, and payment duly demanded of them. Rennolds further testified that before the note matured he told the appellees that he intended, on behalf of Miss Lynch, to have it protested if it were not paid, and to hold them responsible; and that was why he had insisted upon their endorsing it; they never denied their obligation to pay the note; but after it was due, admitted they owed the money, promised to pay it, and

.said they were making negotiations to raise money for the purpose, and requested that no suit should be brought upon the note; and it was upon their request that suit was not sooner brought.

Thomas H. Boyer on the part of the defendants, testified that in 1872 and subsequently he was President of the Old Town Permanent Building Association; that the note dated June 18th, 1872, was issued to the defendants under Article IX of the Constitution on the mortgage offered in evidence; that no money was paid by the Association to the defendants, but the note was accepted by them as money.

The witness further testified, subject to exception, pointing to the printed impression on the note sued on, "that is the seal of the Association—that is our seal; we had no other seal; we recognized and adopted that seal when the note was filled up; that particular seal in that particular case was recognized as ours; all the officers who signed that note recognized that as our seal."

On cross-examination, the witness testified; "There was no action of the Board of Directors, that I know of, recognizing the seal; the only recognition of it was the issue of the notes with it upon them."

Prayers were offered on both sides, but their insertion is deemed unnecessary. The defence set up was that the note in question was to be regarded as a sealed instrument, and that therefore the defendants were not legally responsible on their mere endorsement; and this defence was sustained by the rulings of the Court. The verdict and judgment were for the defendants, and the plaintiffs appealed. . .

The cause was argued before BARTOL, C. J., STEWART, MILLER, ALVEY and ROBINSON, J.

*William A. Fisher* and *Arthur W. Machen*, for the appellants.

The writing in question, upon the evidence, was a promissory note, and not a specialty. The instruments, the Board of directors of the association were authorized to issue, were called *promissory notes ;* and the definition of a promissory note is a promise in writing payable to order or bearer, and " signed but not sealed." *Byles, ch.* 2. Farther, it is expressly said that they are to be drawn *to order ;* which cannot effectively be done unless the instrument is negotiable. It is required that they shall be drawn to the order of the party to whom they are issued, and that he must *endorse* them ; and " the effect of *endorsing* is a conditional contract on the part of the endorser, to pay the immediate or any succeeding endorsee or bearer, in case of the acceptor or maker's default." *Byles, ch.* 1, *page* 2. If we look at the course of dealing, it is even more apparent that nothing capable of affecting the negotiability of the instrument could have been designed. In lieu of money, which ordinarily the borrower would be entitled to receive, the Association gave its note. That the note should be seen to have a substantial guaranty it bore in the margin a statement that it was issued on a mortgage executed by the payee. The mortgagor was *required* to *endorse* it. Issued in place of money, it was expected that it would be discounted, so as to enable the payee and endorser to obtain that use of money which was the only object he could have had in creating an encumbrance upon his property. Such, accordingly, was the consequence. The notes were negotiated like other commercial paper upon the combined credit of the two parties who made themselves responsible upon it by their signatures—the Building Association as maker, the borrowers as endorsers. In addition, the note had the strength derived from the fact that real property, of supposed equivalent value, was pledged for the payment of the debt represented by it—not directly as in the common case of a mortgage and mortgage note, but circuitously by being

made to the maker, as an indemnity against the consequences of the liability assumed in giving such a note. The effect of the whole was to make the endorser the party primarily liable, while the association stood as an accommodation maker, secured by the mortgage.

But is there any principle or "stubborn rule of law," which prevents this instrument from having the effect it was designed to have, and which the conduct of the parties shows that they all originally contemplated? On the contrary, it is a well recognized principle, that if a seal is added to an instrument which does not require it, and the presence of the seal operates to prevent the writing from having the effect it was intended to have, such seal may be treated as surplusage and disregarded. *Hunter vs. Parker*, 7 *M. & W.*, 322; *Wood vs. Auburn & Rochester R: R.*, 4 *Seld* , 167; *Worrall vs. Munn*, 1 *Seld.*, 229; *Robinson vs. Crowder*, 4 *McCord*, 519; *Irwin vs. Brown*, 2 *Cranch C. C.*, 314; *Bratton vs. Burton & Mills*, 1 *Chitty's R.*, 707; *Eureka Co. vs. Bailey Co.*, 11 *Wall.*, 491; *Arnold vs. Rock River Valley Union R. R. Co.*, 5 *Duer*, 208, 215.

There is the more reason for rejecting the seal in this case, because if the Board of directors assumed to attach the corporate seal to the note they acted without authority. They had authority to *sign* the notes, but none to seal them. And not only was it beyond *their* authority, but the Association itself had no right to put a seal to an instrument of that character, issued under the IXth Article of its constitution : to do it was *ultra vires.*

A corporate seal does not prove itself. And to entitle the printed circle in question to be received as the corporate seal of this Association, it was necessary to produce a corporate act making it the seal. Nothing less than a vote of the Board of directors could amount to such an act, even if it did not require, as it seems it did under the Articles, a resolution of the Association itself. 2 *Phill.*

*Ev.*, 385 *top*, (*Edition of* 1867 ;) *Jackson vs. Pratt*, 10 *Johns.*, 386; *Damon vs. Granby*, 2 *Pick.*, 353.

Even where the seal is proved to be the seal of the corporation, its mere presence upon a document does not make the latter the deed of the corporation; it is necessary to show further that the seal was put there by some one duly authorized to do so. *Koehler vs. Black River Falls Iron Co.*, 2 *Black.*, 716; *Damon vs. Granby*, 2 *Pick.*, 352. No evidence was offered of any resolution or other act of the Board of directors, authorizing the issue of the note in question, or other similar notes, as sealed instruments, or adopting said seal or imprint, as the seal of the said corporation; there was no evidence at all before the Court, upon which it could hold the note to have been sealed by the Association.

The presumption, which in this State, since the decision of *Trasher vs. Everhart*, 3 *G. & J.*, 246, has been understood to exist, (somewhat in conflict perhaps with the common law, as now recognized in England, as well as elsewhere,) that a scroll appearing upon an instrument signed by a natural person, even without words importing an intent to affix a seal, is the seal of such person, never has been held to apply to the case of a supposed *corporate* seal, and from the nature of the case cannot so apply. Hence, although the rule in Massachusetts as to the deeds of *natural* persons, may be conceded to be different from that which has been adopted here, the case of *Bates vs. Boston & N. Y. Cent. R. R. Co.*, 10 *Allen*, 251,—a case of a printed fac simile of a seal sought to be treated as a *corporate* seal—is of undiminished authority. *Kinzie vs. Chicago*, 3 *Ill.*, (2 *Scam.*,) 187.

The printed circle here is not necessarily the seal of the Association, any more than the oblong figure, with the word *stamp* in it, frequently printed upon check blanks is the actual stamp whose place it indicates. Its presence no more makes the writing afterwards written upon it a sealed

instrument, than the red picture of the Treasury seal on a National Bank note, or on a Legal Tender note, makes either of those documents a contract under seal.

*John Henry Keene, Jr.*, for the appellees.

*Orville Horwitz,* being interested, as representing several defendants to cases in the Courts of Baltimore City, in one of the questions involved in this case, was permitted to present his views thereon. He argued that the effect of such endorsement on a single bill operates as a mere assignment of the equitable interest in the said bill of the payee or holder, and in the absence of any special agreement to the contrary, and in the absence of fraud, it creates no liability, actual or contingent, against the assignor.

The instrument in question being under seal is *not a bill of exchange.* To quote the language of Ch. J. GILPIN in *Conine vs. J. & B. R. R. Co.*, 3 *Houston*, 299, "from that day—the time of James the First—to this, no case can be found in the books of a bill of exchange with a seal affixed to it."

The distinctions between sealed instruments and bills of exchange are too well marked to need repetition or authority. None, however, are better established than the negotiability of bills of exchange and the non-negotiability of specialties; the transfer by *endorsement* of bills of exchange, and the assignment of *choses in action. Story on Bills*, ch. 4, sec. 61; *Glyn vs. Baker*, 13 *East*, 515, 516; *Warren vs. Lynch*, 5 *Johns.*, 239; *Clark vs. Farmers' Man. Co.*, 15 *Wend.*, 256; *Foster vs. Floyd*, 4 *McCord*, 159; *Helfer vs. Alden*, 3 *Min.*, 332.

What, then, is the effect of the endorsement of the name of the obligee of a specialty in blank?

The endorsement in blank authorizes the holder to write over the name of the endorser in blank only the contract implied by law, and nothing more. *Tenney vs.*

*Prince*, 4 *Pick.*, 385 ; *Nevins vs. De Grand*, 15 *Miss.*, 436.

The contract of endorsement on commercial paper becomes a commercial contract, operating as a contingent guaranty *where the paper is negotiable ;* to any other *chose in action* it becomes an equitable assignment of the beneficial interest, without recourse to the assignor ; and this is, therefore, the only contract which can be legally written over the blank endorsement. *Kirkpatrick vs. McCullough*, 3 *Humph.*, 173 ; *Parks vs. Duke*, 2 *McCord*, 380 ; *Folwell, et al. vs. Beaver, et al.*, 13 *S. & R.*, 314-316 ; *Frevall vs. Fitch*, 5 *Wharton*, 325 ; *Patterson vs. Poindexter*, 6 *W. & S.*, 230, 235 ; *Cummings, Assignee, vs. Lynn*, 1 *Dall.*, 444 ; *Parker vs. Kennedy*, 1 *Bay*, 398 ; *Ex'rs of Garretsie vs. Van Ness, Pennington's Rep.*, (*N. J.*,) 13-24.

To such single bills there are no days of grace, and demand and notice (if any demand and notice can be effective in creating responsibility) should be made and given on the day of actual maturity. *Skidmore vs. Little*, 4 *Texas*, 301 ; *McMullen vs. Abbott*, 1 *Oregon*, 258.

Not only so, but the diligence required of the holder of a note, even of a promissory note which is not negotiable, is to demand the amount, as soon it falls due, of the maker, and, in the event of failure to pay, to sue him immediately. *Swift's Ev.*, 347.

The Code in the 8th section of the 9th Article would seem to point out the only cases in which the assignor of a specialty can be held responsible to the assignee.

Alvey, J., delivered the opinion of the Court.

Whether the note sued on is to be treated as a negotiable promissory note, or as a single bill, under the seal of the corporation, the maker, is the main question in this cause, and the one upon which all the other questions depend. According to the rulings of the Court below,

the instrument was held to be a single bill, and consequently the appellees were not liable on a mere endorsement of the note, as they would have been if the note had been a negotiable promissory note, instead of what it was held to be.

The appellees being sued, and sought to be held liable, by reason of their endorsement of the note, if the instrument be in reality a specialty, though in the form of·a promissory note, no obligation or liability arose from the mere endorsement of it, either by the statute or the custom of merchants.   As a sealed instrument, it could be assigned, as required by the statute,.to enable the assignee to sue in his own name ; but then no liability would arise by the assignment, upon which the assignor could be held responsible, unless the assignment be made in the manner and form prescribed by the Code, Art. 9, secs. 8 and 9, or unless the assignment embody a separate and distinct contract or undertaking, as in the case of *Gist vs. Drakeley,* 2 *Gill,* 330.   If the endorsement of a sealed instrument be in blank, accompanied by delivery, the party to whom the instrument is delivered may. fill up the blank, with a full assignment to himself, and thus become absolute owner, with right to maintain suit in his own name, within the meaning·of the statute ; and though the assignment may not be extended until the time of trial, it is regarded, for the purposes of the suit, as having been made in its extended form when the instrument was endorsed ; as was the case in *Chesley vs. Taylor,* 3 *Gill,* 251.

Here, the note was endorsed in blank by the appellees, who were the payees in the note, and after such endorsement, but before or at the time.of the trial, the appellants wrote over the blank endorsement the words, " We hereby endorse and assign the within, and direct payment thereof to be made to Priscilla Lynch," one of the appellants. This was good as an assignment, upon the assumption

that the note was a single bill; and it was all-sufficient as an endorsement in full, treating the instrument as a negotiable promissory note. As an endorsement of negotiable paper it created a liability on the part of the appellees, but as an assignment of a non-negotiable *chose in action* it created none, and only transferred the right of the assignors, with the power to sue and maintain an action on the note in the name of the assignee. It was in this latter aspect that the Court below instructed the jury against the right of the appellants to recover on the endorsement against the appellees.

But is the note a specialty or single bill, as distinguished from a promissory note, made negotiable by the statute of 3 and 4 Anne, ch. 9? The Building Association that made the note, was organized under the present general incorporation law of the State, and by the 9th and 11th articles of its association, it is provided that its board may issue promissory notes on mortgages only, and that such notes shall always be drawn to the order of the mortgagor, who shall, in all cases, endorse the notes thus drawn. The president, secretary, treasurer and three directors, are authorized to *sign* all promissory notes issued by the association. The note in question was issued on the mortgage of the payees of the note, and is conceded to have been under the authority of the articles just referred to. The note is strictly in form a promissory note, payable to the order of the payees named, who are the present appellees. It was drawn at sixty days time, and payable at a certain named bank. It has been treated as ordinary negotiable paper, and hence it was protested for non-payment. It was signed by the officers designated in the articles of association to execute promissory notes, and the only thing that is supposed to deprive it of the qualities of such paper is the appearance, in one corner of the face of the note, of the type or emblem of what is said to be the seal of the corporation. There is no statement or declaration in any

part of the note that it was, or was designed to be, executed under the corporate seal. What is alleged to be the seal consists simply of an emblem or symbol printed by the printer at the time when the printed blank note was struck   Whether this printed symbol is a sufficient seal, or can be made sufficient by adoption, is a question that we need not now decide; for, even conceding it to be a sufficient representation of the corporate seal, still, we are of opinion that the note in question is a negotiable promissory note, by the endorsement of which in the ordinary manner liability attached to the endorser.

In this case, as we have seen, the officers of the corporation signing the note were authorized and directed to issue promissory notes in a negotiable form, and it should be presumed that they intended to conform to their authority rather than violate it. But, apart from this consideration, the very nature of the transaction itself, the objects and purposes to be subserved by the issue of the note, as well as its form, plainly indicate that the parties must have understood that the note was negotiable, and that it would be so accepted and dealt with by the commercial community. The Building Association issued the note to the appellees, instead of money for which the mortgage was given. It was certainly contemplated, that the appellees should negotiate the note, in order to obtain the money that the Association had contracted to loan, and that was rendered impossible, from the form of the note, except by endorsement. No bank or banker, would likely discount the note, if not negotiable, upon mere assignment, subject to the equities existing between the original parties. It sufficiently appears that the present note, and others like it, have been dealt with by the banks, and the commercial community generally, as ordinary negotiable paper; and in their understanding of the nature and qualities of these instruments, we think they have not been mistaken. The symbol or printed representation

of the seal, if it be conceded to be a sufficient seal, was not printed on the note to restrain its negotiability, or to change it into a specialty, but rather as a mark of genuineness. The note in no manner depends upon the seal for its validity, but derives its entire authenticity from the signatures of the officers authorized to execute it. This view of the subject is fully sustained by the recent cases of *Dinsmore vs. Duncan*, 57 *N. Y.*, 573, and *Vermilye vs. Adams Express Co.*, 21 *Wall.*, 138, involving the consideration of the nature and qualities of the United States treasury notes, issued under the seal of the treasury, as authorized by the Act of Congress of March 3, 1865.

The authorities mainly relied on by the appellees in support of the position that because there is a seal, or the representation of a seal, on the note, therefore the note must be a specialty, are the cases of *Trasher vs. Everhart*, 3 *Gill & John.*, 234; *Stabler vs. Cowman*, 7 *Gill & John.*, 284, and *Gist vs. Drakeley*, 2 *Gill*, 330. The first two of these cases presented no question as to what constituted, or as to the effect of printing a representation of a corporate seal on an instrument executed by a corporation; but were cases where the instruments involved were executed by individuals, using the scrawl at the end of their names as seals. The law settled by those cases we in no manner design to disturb. Nor do we propose to qualify or disturb any of the principles decided in the case of *Gist vs. Drakeley*. That case, however, is quite distinguishable from the present. There, the two notes executed by the corporation, though in the ordinary form of promissory notes, bore upon their face such evidence of design as to leave no doubt of their real character. They bore the regular impress of the seal, attested by the signature of the president; the notes concluding with the words, "Witness the seal of the Company, attested by the signature of the president."

30 v. 43.

The seal was the only real evidence of execution, the signature of the president being added to attest the affixing of the seal to the instruments. Not so in the execution of the note before us.

With these views, differing from those entertained by the Court below as to the nature and character of the note in suit, and without referring specifically to the several prayers offered on each side, as they will be of little or no importance in the re-trial of the cause, we shall reverse the judgment appealed from, and award a new trial.

*Judgment reversed, and*
*new trial awarded.*

(Decided 21st January, 1876.)